IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| ANGELINA MITCHELL and JERRAINE CANNON, on behalf of themselves and all others similarly situated,<br><br>                Plaintiffs,<br><br>      v.<br><br>SMITHFIELD PACKING COMPANY, INC.,<br><br>            Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)   C/A No.: 4:08-CV-182-H<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DEFENDANT'S MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

COMES NOW Defendant Smithfield Packing Company, Inc. ("Smithfield" or "Defendant"), by and through its undersigned counsel, and hereby submits this Memorandum in Opposition to Plaintiffs' Motion for Class Certification. For the reasons stated herein, the Court should deny Plaintiffs' Motion.

## I.  INTRODUCTION

Plaintiffs initiated this action on October 24, 2008, against Defendant alleging they were owed additional compensation for certain donning, doffing, and related activities under the Fair Labor Standards Act ("FLSA"). Smithfield is a pork processing company with a processing plant formerly located in Kinston, North Carolina ("K-1"). Plaintiffs are former employees of Smithfield's K-1 facility.

On November 6, 2009, Plaintiffs amended their complaint to specifically include a claim under the North Carolina Wage and Hour Act ("NCWHA"). In their First Amended Complaint, Plaintiffs allege that they were not fully compensated for time spent donning, doffing, and cleaning and sanitizing certain gear, as well as for time they spent waiting to punch a time clock and walking to and from the production floor. Plaintiffs advocate a "first touch" rule in which they seek to be compensated from the moment they touch certain items at the beginning of their shift to the time in which these items are doffed and discarded at the end of their shift. According to Plaintiffs, Smithfield's failure to compensate Plaintiffs in

1

this manner violates both the FLSA and the NCWHA. Smithfield timely answered Plaintiffs' First Amended Complaint denying Plaintiffs' allegations.

Specifically, Plaintiffs assert a payday claim under Section 96-25.6 of the NCWHA alleging that Smithfield violated Section 95-25.6 by allegedly depriving Plaintiffs of wages they accrued on the regular payday. N.C. Gen. Stat. § 95-25.6. Plaintiffs suggest that Rule 23 class treatment of this claim is appropriate because the proposed class was subject to a common policy of not receiving full compensation for donning, doffing, and related activities. The Court should reject Plaintiffs' attempt to generalize Smithfield's compensation practices on this abstract level as a way to manufacture an appearance of commonality and uniformity among the proposed class. Indeed, there are significant differences among members of the proposed class, including:

- the type of items and the time in which these items are donned and doffed

- the amount of time to engage in donning, doffing, and related activities

- the pay practices and policies related to donning, doffing, and related activities

As a result of these broad differences among the proposed class, Plaintiffs' claims are necessarily highly individualized. Therefore, different liability issues and defenses exist for each class member. It is solely Plaintiffs' burden to show that the proposed class members' claims are homogenous to such an extent that a Rule 23 class action is proper in this case. Plaintiffs have failed to make this showing. Additionally, Plaintiffs Mitchell and Cannon cannot fairly and adequately represent the proposed class because they have given sworn, contradictory testimony in this action and also lack basic knowledge concerning the fundamental issues involved in this case. Accordingly, for the reasons articulated below, the Court should deny Rule 23 class certification of Plaintiffs' NCWHA payday claim.

2

## II. **FACTS**

**A.     Operations at the K-1 Facility Varied By Department.**

      The K-1 facility in Kinston, North Carolina processed pork product until the facility closed in May 2008.  (Allen Dep. 17:22-25; Mitchell Dep. 23:4-5.)[1]  Employees at the Kinston facility were represented by a union.  (Allen Dep. 11:4-8; Mitchell Dep. 77:18-25.)

      Production at the K-1 floor occurred on one floor in a raw area and ready to cook area.  (Dixon Dep. 18:16-19; 32:25-36:3.)  Employees used different stairways to access the raw side and ready-to-cook side.  (*Id.* at 36:12-20.)  The raw side included the Boneless Pump Department, the Bone in Pump Department, and the Ham Stuffing Department.  (*Id.* at 36:6.)  The ready-to-cook side included the Smokehouse Department, West Pack Department, Smoke Chops Department, and Massage or Vat Room.  (*Id.* at 36:6.)  Because pork was processed in a linear fashion, production throughout the K-1 facility and within each department started and stopped on a staggered basis.  (*Id.* at 61:3-4, 72:5-25, 78:4-9.)  Start times varied for each department, and stop times varied based on production.  (Allen Dep. 11:23-25, 20:8-14; Mitchell Dep. 24:8-14, 36:4-5; Cannon Dep. 30:18-24, 47:5-8.)

**B.     Donning, Doffing, and Related Activities Varied According to Job.**

      Employees at the K-1 facility donned and doffed sanitary and protective items at different locations: the locker room, in the hallway as they walked to the workstation, in the supply room, or at their work station.  (Dixon Dep. 41:11-13; Cannon Dep. 48:2-7, 22-24; 49:18-21.) Locker rooms were located at the top of the stairway by which employees accessed the K-1 facility.  (Dixon Dep. 19:17-21.) In the locker rooms, employees donned boots, bump caps, and ear plugs, which were attached to their bump caps.  (*Id.* at 41:11-13.)  Other items worn by employees varied by department and job.  (*Id.* at 21:16-20, 23:8-24:24.)  For example, employees who used a knife were required to wear a cut resistant glove.  (*Id.* at 23:14-15.)  Employees could choose to wear optional items such as plastic sleeves or a plastic apron.  (*Id.* at 24:7-10, 29:16-17.)

---

[1] All deposition testimony cited herein is attached to this memorandum as follows: **Exhibit A** - Allen Dep, **Exhibit B** – Cannon Dep, **Exhibit C** – Dixon Dep, and **Exhibit D** – Mitchell Dep.

Employees walked from the locker room down one of the stairways to enter the raw area or the ready-to-cook area. (Dixon Dep. 41:14-24; Cannon Dep. 47:11-13.) At the base of the stairs, employees walked through a "foot bath" or shallow pool of chlorinated water which sanitizes employees' boots as they walk through it. (Dixon Dep. 38:23-39:4.)

The raw side supply room was located at the base of the raw side stairway on the same level as production. (Dixon Dep. 26:9-13.) Production employees acquired a lab coat and other items, such as cotton gloves and sleeves, if desired, from the supply room (or "laundry room"). (Dixon Dep. 25:13-14; Cannon Dep. 48:2-7.) Employees could don their smock as they walked to their work station from the supply room. (Cannon Dep. 48:22-24.) The laundry room was close to employees' work stations on the raw side of the plant. (Mitchell Dep. 44:10-12 ("It was close, but I don't know how far. It was close").) Employees had the option to acquire items from the supply room before shift or at the end of shift. (Cannon Dep. 48:2-7, 79:25-80:5.) Knife wielding employees had the option of acquiring a cut glove from the supply room or their department. (Dixon Dep. 25:18-21.) Some employees chose to don some items such as sleeves and gloves at their work station after clocking in. (Cannon Dep. 49:18-21.)

The ready-to-cook area had two different clean rooms—one for the West Pack department and one for the East Pack department. (Dixon Dep. 58:10-17.) Employees who worked in the ready-to-cook areas did not go to a supply room. (*Id.* at 136:18-20.) Employees acquired gloves, lab coats, and sleeves, if required, from a clean room located immediately in front of the door to the ready-to-cook production lines. (*Id.* at 40:17-23.) Supplies were set up in the clean room "like a buffet line" so that employees could "just pick up their things as [they] walk[ed] through." (*Id.* at 136:18-25.) On the ready-to-cook side, employees washed their hands in the clean room, donned items (other than their boots, bump cap, and ear plugs), and dipped or sprayed their hands before walking to the production lines. (*Id.* at 42:7-10.) The ready-to-cook area was equipped with three different sanitizing areas for employees to wash their hands as needed. (*Id.* at 54:18-55:10.) Employees could also wash their hands at a line of sinks in each department. (*Id.* at 65:20-24.)

Approximately five different 30-minute lunch breaks were staggered during each shift. (Dixon Dep. 92:9-16; Allen Dep. 21:9-12.) During the lunch break, employees hung their smocks near their work station in their area or in the clean room. (Dixon Dep. 130:15-20.) Employees in smaller departments clocked out for lunch, but employees in larger departments did not clock out for lunch. (Allen Dep. 20:15-21:7.) Employees threw away their gloves or sleeves and wore their boots, ear plugs, and bump caps into the lunch room. (Dixon Dep. 130:15-20.) At the end of shift, on their way out of their production areas, employees threw their coat into a bin, threw away their disposable items, placed their boots and bump cap in their lockers, and left the facility. (*Id.* at 137:19-138:2.) Any sanitizing that employees engaged in at the end of their shift was completed during their paid shift before they clocked out. (*Id.* at 138:3-9.) Employees were only required to leave their boots and their bump cap in their locker. (Dixon Dep. 89:12-17, 137:23-138:2; Allen Dep. 80:8-10.) Employees could wear other disposable items home with them if they wished. (Allen Dep. 80:11-14.)

## C.    Pay Policies and Practices Varied By Job and Department.

At the K-1 plant, at least seven different time clocks were situated in close proximity to the entrance to production or work areas. (Dixon Dep. 43:17-25, 60:13-18; Allen Dep. 18:5-7, 18:24-19:2.) Employees used manual time cards to punch in and out at the time clocks. (Allen Dep. 18:5-12.)

Plaintiffs allege that they were only compensated for time spent on the production line. Pls.' Mem. at 4. This is incorrect. Neither Mitchell nor Cannon testified that they were paid only when the line was moving. In fact, Jerraine Cannon testified that he had no idea how he was paid each day. *See* Cannon Dep. 83:5-9. Moreover, Antiquea Allen, Controller for the K-1 plant, clearly testified that employees at the K-1 plant were paid from the beginning of their scheduled shift until their punch out. (Allen Dep. 14:6-8; 11:14-19.) In May of 2006, Smithfield adopted a new compensation policy in which it paid additional compensation to employees in the West Pack and East Pack departments for donning, doffing, and related activities. (*Id.* at 28:9-21, 34:10-14, 68:15-73:8.) Specifically, Smithfield began paying these employees an additional five minutes of compensation each day for donning, doffing, and related activities. (*Id.* at 26:22-27:11.) Box makers and jack drivers, however, were not deemed eligible

5

to receive additional compensation for donning, doffing, and related activities, which Smithfield refers to as "prep time." (*Id.* at 68:23-69:2.)

In addition, at the time that the Company implemented its new policy, Smithfield paid current employees in eligible positions in West Pack and East Pack a retroactive lump sum for donning, doffing, and related activities for the three previous years to May 2003. (*Id.* at. 26:22-27:1, 34:12-19.) K-1's HR Manager, Pamela Kienast, recorded the complaints of all K-1 employees who disputed the amount received or their eligibility to receive this retroactive compensation. (*Id.* at. 30:10-31:6.) Ms. Kienast met with superintendents and Antiquea Allen, Plant Controller, on a weekly basis to review complaining employees' dates of employment and job positions to determine whether they were eligible for retroactive pay. (*Id.* at 13: 19-14:11, 31:14-32:17.)

During his deposition, Mr. Cannon testified that he did know when he started getting paid and stopped getting paid each day that he worked at the K-1 plant. (Cannon Dep. 83:5-9.) Neither Mr. Cannon nor Ms. Mitchell were promised that they would be paid for donning and doffing activities, and both testified that they were paid precisely in the manner that they were told they would be paid. (Cannon Dep. 82:13-20, 83:2-4; Mitchell Dep. 76:1-77:17.) Mr. Cannon further testified that he did not know that Smithfield compensated employees at the K-1 plant five minutes of additional compensation each day for donning, doffing, and related activities. (Cannon Dep. 84:10-14.) He also was unaware that the Company made a retroactive payment in 2006 for donning, doffing, and related activities. (*Id.* at. 84:13-18.) Ms. Mitchell testified that she knew some employees were compensated for donning, doffing, and related activities and that she was bringing this lawsuit because she thought she should be paid for these activities also. (Mitchell Dep. 82:25-83:7.)

**D.    Employees Spent Varying Amounts of Time Engaged in Donning, Doffing, and Related Activities.**

**1.    Ms. Mitchell's Testimony Concerning the Time She Spent Engaged in Donning, Doffing, and Related Activities is Contradictory.**

Angelina Mitchell filed an affidavit in support of Plaintiffs' Motion for Conditional Certification in which she averred that she spent 30 minutes before her shift began putting on sanitary and protective

6

items, obtaining sanitary and protective items, sanitizing, and walking to her work station (Mitchell Aff., Doc. 70-12, ¶ 6.) During her deposition, however, Ms. Mitchell testified that she had no idea how long it took her to engage in any donning or sanitizing activities at the beginning of the day. (Mitchell Dep. 39:6-13, 41:3-15, 42:12-21, 66:6-14, 68:9-10, 69:25-70:5.)

In her affidavit, Ms. Mitchell testified that during lunch, she spent 15 minutes putting on, taking off, and sanitizing her sanitary and protective items. (Mitchell Aff., Doc. 70-12, ¶ 8.) In her deposition, however, Ms. Mitchell testified that she had no idea how long she spent engaged in donning, doffing, and related activities during her lunch break. (Mitchell Dep. 52:22-53:6.) She further testified that during each lunch break she removed sanitary and protective items near her work station, removed her boots and hair net in her locker, purchased chips and a soda from a vending machine near the locker room, went outside, ate her chips and soda, socialized with Bonita Cannon, Marie Boyd, and Fontina Thompson, returned to the locker room where she donned her boots and hair net, and re-donned her items at her work station. (*Id.* at 52:22-58:15.) In addition, Ms. Mitchell sometimes frequented a convenience store during her 30-minute lunch breaks. (*Id.* at 56:24-57:10.)

In her affidavit, Ms. Mitchell admitted that the amount of time that she spent each day engaged in doffing and related activities at the end of her shift varied. (Mitchell Aff., Doc. 70-12, ¶ 9.) Specifically, Ms. Mitchell averred that she spent five to ten minutes each day doffing. (*Id.*) In her deposition, however, Ms. Mitchell testified that she had no idea how long it took her to engage in doffing activities. (Mitchell Dep. 62:6-20, 75:14-18.)

Ms. Mitchell testified that she has brought this lawsuit on behalf of other employees to recover wages. "I feel like, well, everybody needs to be paid for the time that they got in the locker room and did all their PPEs before they clocked in and everything . . . whatever time they spent." (Mitchell Dep. 79:21-80:1.) Angelina Mitchell was admittedly subject to a different pay policy than the employees that they seek to represent. (*Id.* at 79:10-11, 83:4-7.) She testified that she did not work in an eligible position and therefore brought this lawsuit to recover donning and doffing compensation that other employees received. (*Id.* 79:10-11, 83:4-7.)

Even though Ms. Mitchell seeks compensation for employees' time in the locker room, she admitted that some employees engaged in non-compensable activities in the locker room such as combing their hair and putting on makeup. (*Id.* at. 37:19-24, 80:6-12.) In addition, Ms. Mitchell testified that she did not engage in donning, doffing, and related activities efficiently; specifically, she put on her hair net and hard hat near her locker but then took off her hard hat and hair net in the bathroom and put these items back on. (*Id.* at 36:23-37:2, 41:23-42:2, 44:24-25, 45:12-13, 48:2-6, 49:8-12, 50:5-8, 50:13-19.)

### 2. Mr. Cannon's Testimony Concerning The Time He Spent Engaged in Donning, Doffing, and Related Activities Is Contradictory.

Jerraine Cannon filed an affidavit in support of Plaintiffs' Motion for Conditional Certification in which he averred that he spent 30 minutes before his shift began putting on sanitary and protective items, obtaining sanitary and protective items, sanitizing, and walking to his work station (Cannon Aff., Doc. 70-13, ¶ 6.) At his deposition, however, Mr. Cannon testified that he had no idea how long he spent engaged in donning and related activities or any other non-compensable activities prior to his shift. (Cannon Dep. 43:6-13, 43:23-25, 44:10-14, 45:78, 46:8-12, 46:24-47:4, 47:19-23, 48:2-14, 48:25-49:2, 50:5-7, 51:4-8, 51:18-22.)

Mr. Cannon further testified that he arrived at the plant 30 minutes before his shift began. (*Id.* at 31:2-5, 34:19-22.) He did not have his own car when he worked at the K-1 facility and took a cab each day to work. (*Id.* at 31:6-7.) Mr. Cannon testified that he wore a lightweight hair net, beard net, hard hat, smock, sleeves, cotton gloves, yellow rubber gloves, and a plastic bag. (*Id.* at 44:15-45:8, 45:25:46:12, 48:5-7, 51:11-17, 56:21-25, 77:22-78:8.) In his affidavit, however, Mr. Cannon averred that he wore an apron instead of the plastic bag. (Cannon Aff., Doc. 73-14, ¶ 5.)

In his affidavit, Mr. Cannon averred that he spent 10 minutes engaged in donning, doffing, and related activities during lunch. (*Id.* at ¶ 8.) At his deposition, however, Mr. Cannon testified to the contrary that he had no idea how long he spent on donning doffing, and related activities during his lunch. (Cannon Dep. 56:7-18, 57:18-58:2, 61:9-14, 62:6-11, 63:12-21, 65:19-66:10.) During his break, Mr. Cannon doffed his gloves, coat, sleeves, and plastic bag at his work station and hung the items near

8

his work station.  (*Id.* at 55:21-56:6, 57:2-11.)  He says he then walked to the break room and chose to hang his bump cap along with his smock outside of the break room.  (*Id.* at 58:2-4, 60:21-61:5.) Mr. Cannon testified that he waited in line to purchase food from a vending machine, waited to use a microwave, ate a snack, and socialized with co-workers.  (*Id.* at 58:2-4, 58:14-21, 62:12-21, 63:12-18, 64:6-15.)  Mr. Cannon admitted that he chose to engage in donning, and related activities in an inefficient manner; specifically he chose to sanitize, don his items, and re-sanitize.  (*Id.* at 59:23-60:15.)

In his affidavit, Mr. Cannon averred that he spent five minutes after his shift engaged in donning, doffing, and related activities.  (Cannon Aff., Doc. 70-13, ¶ 9.)  However, Mr. Cannon subsequently testified that he has no idea how long he spent engaged in post-shift doffing and related activities. (Cannon Dep. 70:14-22, 71:10-13, 74:1-3, 74:18-25.)  At the end of his shift, Mr. Cannon doffed the plastic bag that he wore at his work station and threw it away.  (*Id.* at 69:3-13.)  He testified that then clocked out and walked to the counter in the smock room, where he removed his smock, sleeves, and gloves.  (*Id.* at 68:15-22, 69:3-13.)  Mr. Cannon says he then chose to sanitize his boots and walk back to the supply room counter to acquire a hair net and beard net for the next day.  (*Id.* at 70:23-71:5, 71:14-24, 72:7-21.)  Mr. Cannon admitted that he could have turned in his smock and acquired the hair net and beard net simultaneously, but he chose not to.  (*Id.* at 72:18-73:2.)  After his shift ended, he often waited an hour for another co-worker's shift to end to catch a ride home.  (*Id.* at 33:17-22, 75:1-12.)

Although Mr. Cannon averred that he discussed donning and doffing with dozens of employees who he worked with on a daily basis and who informed him that they were not paid for their donning, doffing, and related activities, at his deposition he testified that he did not know whether he had discussed it with more than five people.  (Cannon Aff., Doc. No. 7-14, ¶ 11; Cannon Dep. 84:19-85:11.)  Mr. Cannon testified that he was unable to recall the names of these employees or the substance of these alleged conversations even when Defendant's counsel attempted to refresh his recollection with his Interrogatory responses.  (Cannon Dep. 85:12-88:9, 92:22-96:4.)

Mr. Cannon testified that he had no idea when he started getting paid and stopped getting paid at Smithfield.  (*Id.* at 83:5-83:10.)  He had no idea that Smithfield paid certain employees five additional

minutes of compensation each day for donning, doffing, and related activities or that Smithfield made a retroactive payment for those activities. (*Id.* at 84:10-18.) However, Mr. Cannon worked as a jack driver from 2005 to 2008 and was not paid five additional minutes of compensation for donning, doffing, and related activities because he worked a jack driver. (Allen Dep. 68:23-69:2; Cannon Dep. 29:17-30:13.) Mr. Cannon testified that he has brought this lawsuit seeking compensation from the time that he arrived at the K-1 facility until he left the locker room at the end of the day. (Cannon Dep. 88:16-89:4.) Mr. Cannon asserts that he is entitled to this compensation even though he testified that he spent some of this time on non-compensable activities such as stowing personal items in his locker. (*Id.* at 35:4-10.) Further, he seeks this compensation even though some donning, doffing, and related activities were inefficient due to his personal discretion. For example, Mr. Cannon chose to acquire some items from the supply room before his shift and other items after his shift the following day. (*Id.* at 48:2-7, 79:25-80:5.) He chose to doff his bump cap during the breaks, even though this was not required, and he chose to sanitize twice at the end of his lunch breaks. (Cannon Dep. 59:23-60:15, 60:21-61:5; Dixon Dep. 130:15-20.) Mr. Cannon only wishes to represent other employees who have "fallen into the same situation." (Cannon Dep. 89:5-91:22.) He is not sure whether he wishes to represent employees who did not spend the same amount of time that he chose to engage in donning, doffing, and related activities. (*Id.*)

> **3. Other Employees Aver That They Spent Varying Amounts of Time Engaged in Donning, Doffing, and Related Activities.**

Other employees aver that the amount of time that they spent engaged in donning, doffing, and related activities varied widely even though they all allege that they wore exactly the same items. (Employee Decls., Doc. 73-13 – 73-19, ¶¶ 5-6, 8-9.) For example, Dauna Gooding avers that she spent 15 minutes engaged in donning and related activities before her shift. (Gooding Decl., Doc. 73-16, ¶ 6.) On the other hand, Angelina Mitchell testified that she spent 30 minutes before her shift engaged in donning, even though she could engage in all donning and doffing during her lunch break with extra time to eat outside or go to a convenience store. (Mitchell Aff., Doc. 70-12, ¶ 6; Mitchell Dep. 52:22-58:15.)

Similarly, employees spent different amounts of time during their lunch break engaged in donning, doffing, and related activities. Lakeisha Locust averred that she spent 20 minutes during her lunch break engaged in donning, doffing, and related activities. (Locust Decl., Doc. 73-18, ¶ 8.) On the other hand, Mr. Cannon averred that he spent 10 minutes during his lunch break engaged in donning, doffing, and related activities. (Cannon Aff., Doc. 70-13, ¶ 8.)

Likewise, employees aver that they spent varying amounts of time engaged in post shift activities. For example, Charlene Mills avers that she spent five minutes engaged in these activities. (Mills Decl., Doc. 73-19, ¶ 9.) On the other hand, Lakeisha Locust testified that she spent 30 minutes engaged in post-shift activities where she doffed the same items worn by Ms. Mills. (Locust Decl., Doc. 73-18, ¶ 9.)

Accordingly, employees seek different amounts of compensation for donning and doffing. Specifically, Lakeisha Locust seeks 80 minutes of daily compensation for allegedly donning and doffing the same items worn by Charlene Mills, who seeks only 40 minutes of daily compensation. (Locust Decl., Doc. 73-18 ¶¶ 6, 8-9; Mills Decl., Doc. 73-19 ¶¶ 6, 8-9.)

### III. DISCUSSION AND ANALYSIS

**A.    Rule 23 Standard**

Plaintiffs seek to have their North Carolina state law claims certified as a class action under Rule 23 of the Federal Rules of Civil Procedure. Rule 23 governs whether a class action may be successfully brought against a defendant. The class action device, which allows representative parties to prosecute their own claims and the claims of those who present similar issues, is an exception to the general Rule that a party in federal court may vindicate only his or her own interests. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982).

In deciding whether a proposed class should be certified, a district court is given "wide discretion." *Cent. Weselyan College v. W.R. Grace & Co.*, 6 F.3d 177, 185 (4th Cir. 1993). In fact, when a district court makes "well-supported factual findings supporting its class certification decision," the district court's decision is entitled to substantial deference. *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 434 (4th Cir. 2003). Nevertheless, to properly assess whether the class action device under Rule 23

is appropriate to a particular case as pled by a plaintiff, a district court must conduct a "rigorous analysis" to ensure compliance with Rule 23, including "paying particular attention to the requirements of [that] rule." *Falcon*, 457 U.S. at 161; *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 405 (1977). In deciding whether a class should be certified, a "court may not confine itself to the allegations of the complaint. *Shelton v. Pargo, Inc.*, 582 F.2d 1298, 1312 (4th Cir. 1987). Instead, the court must sufficiently examine the merits to enable it to "make specific findings establishing that the case satisfies the general requirements for certification." (*Id.*)

**B.      Rule 23 Burden of Proof**

For a class action to be certified under Rule 23, Plaintiffs must prove that the proposed class satisfies the requirements of Rules 23(a) and 23(b). *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d at 423. Rule 23(a) specifically establishes four prerequisites that must be met to achieve class action status, including (1) numerosity of parties – the class must be so numerous that joinder of all members is impracticable, (2) commonality – the presence of questions of law or fact common to the class, (3) typicality – the claims or defenses of the class representative must be "typical" of the claims or defenses of the class, and (4) the class representative must fairly and adequately represent the interests of the class. Fed. R. Civ. P. 23(a); *Stott v. Haworth*, 916 F.2d 134, 145-46 (4th Cir. 1990). If the proposed class action fails to meet any of the four requirements under Rule 23(a), consideration of the requirements contained in Rule 23(b) is rendered moot, and the class will not be certified. *Stott*, 916 F.2d at 145-46.

Under Rule 23(b)(3), the court must find that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3) analysis is fact-intensive, and the district court must closely look at the facts pertinent to class certification and make specific findings on the proprietary of certification where necessary. *Windham*, 565 F.2d at 65; *Thorn*, 445 F.3d at 319 (citing *Gariety v. Grant Thorton, LLP*, 368 F.3d 356, 365 (4th Cir. 2004)). "The predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Anchem Prods. v. Windsor*, 521 U.S.

12

591, 623 (1997). The test is "more stringent" than the commonality factor under Rule 23(a). *Lienhart*, 255 F.3d at 146 n.4.

As will be explained in greater detail below, Plaintiffs cannot satisfy the requirements of commonality, typicality, and adequacy under Rule 23(a) or Rule 23(b)(3) with regard to their pay claim under the NCWHA. Accordingly, Plaintiffs' Motion for Rule 23 certification should be denied.

**C.     The Proposed Class Fails the Commonality and Typicality Requirements Under Rule 23(a)(2) and Predominance and Superiority Under Rule 23(b)(3) Because Plaintiffs' Claims Are Highly Individualized and Will Require Fact-Intensive Liability and Damages Inquiries.**

**1.  Legal Standard**

The commonality and typicality requirements of Rule 23(a)(2) and (3) are overlapping and subject to collective analysis. *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 147 (4th Cir. 2001). The purpose of the typicality and commonality requirements is to "ensure that only those plaintiffs or defendants who can advance the same factual and legal arguments may be grouped together as a class." *Broussard v. Meineke Disc. Muff. Shops*, 155 F.3d 331, 340 (4th Cir. 1998) (quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 341 (7th Cir. 1997)). The Fourth Circuit has held that individual inquiries concerning a defendant's liability as to any particular member of the proposed class forecloses satisfaction of the typicality and commonality mandate. *See, e.g., Broussard*, 155 F.3d at 344 (holding that the disparate nature of the claims among the putative class precludes class certification under Rule 23); *Thorn*, 445 F.3d at 319 (quoting 7A Charles Allen Wright, Arthur R. Miller & Mary K. Kane, Federal Practice and Procedure, § 1763 (3d ed. 2005)) ("A question is not common . . . if its resolution turns on a consideration of the individual circumstances of each class member"); *Avalon Center Invest. Co. v. Commercial Defeasance, LLC*, Case No. 3:08-cv-00535-FDW-DCK, Docket Entry No. 102, 2010 U.S. Dist. LEXIS 65239 at *18-20 (W.D.N.C. May 20, 2010) (denying Rule 23 class certification because the claims of the proposed class required individualized analyses and determinations);[2] *Boley v. Brown*,

---

[2] All unpublished case law cited herein is attached as **Exhibit E** to this memorandum.

10 F.3d 331, 342 (4th Cir. 1993) (holding that class certification was properly denied where any resulting harm was dependent upon consideration of unique circumstances pertinent to each class member).

Much like commonality and typicality, the necessity for individualized adjudication of the claims of the proposed class precludes a finding of predominance under Rule 23. *Lienhart*, 255 F.3d at 149 (citing *Windham v. American Brands, Inc.*, 565 F.2d 59, 66 (4th Cir. 1977)) (stating "[i]f such an individualized inquiry is needed to determine the membership of a workable class, it is clear that common issues do not predominate over individual issues"). Thus the need to conduct thousands of individual mini-trials with juries to determine whether a defendant is liable to any particular class member (and/or the amount of damages to which any class member is entitled) renders the trial of such an action as a class action unmanageable and precludes class certification. *Stastny v. S. Bell Tel. & Tel. Co.*, 628 F.2d 267, 275 (4th Cir. 1980); *Windham*, 565 F.2d at 71-72 (holding that conducting mini-trials is antithetical to proceeding as a class suit). Additionally, the common and typical issues must predominate over other questions affecting individualized members such that class action resolution is *superior* to other available methods of adjudication. *Kerr v. City of West Palm Beach*, 875 F.2d 1546, 1557-58 (11th Cir. 1989) (citing Fed. R. Civ. P. 23(b)(3)).

In analyzing whether common questions of law or fact predominate, a court should consider (1) the class members' interests in individually controlling the prosecution or defense of separate actions, (2) the extent and nature of any litigation concerning the controversy already begun by or against class members, (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum, and (4) the likely difficulties in managing a class action. Fed. Rule 23(b)(3)(A-D). The district court should consider the entire case, including the claims, defenses, facts, and underlying substantive law. *Farrar & Farrar Dairy Inc. v. Miller-St. Nazianz, Inc.*, 254 F.R.D. 68, 72 (W.D.N.C. 2008) (citing *Klay v. Humana, Inc.*, 382 F.3d 1241, 1254 (11th Cir. 2004)).

In this case, Plaintiffs broadly define the proposed Rule 23 class as follows:

> All former production and support employees who were employed by Smithfield Packing Company, Inc., as non-exempt, hourly employees at the "K-1" Kinston, North Carolina facility, at any period of time from

October 24, 2005 until May 2008, who were paid on "GANG TIME"
basis.

Plaintiffs claim that Smithfield improperly compensated them utilizing "gang time" and "prep time," which allegedly resulted in its former employees performing donning, doffing, and related activities without full compensation.[3] Instead of compensating Plaintiffs in this manner, Plaintiffs suggest that they should have been compensated for all donning, doffing, and related activities based on a first touch rule in which they would be paid the moment they first touched their respective gear at the beginning of their shift to time in which they last touched an item at the end of their shift. The application of the first touch rule demonstrates the significant differences that exist in the employment settings among the proposed class. Indeed, as will be shown below, substantial differences exist among class members regarding the type of items that were donned and doffed, the amount of time it took to engage in donning, doffing, and related activities, and the pay practices relating to donning, doffing, and related activities.

### 2. The type of items and the time in which these items are donned and doffed varied among the proposed class members

Production at the K-1 facility occurred on one floor in two separate areas: a raw area and ready-to-cook area. (Dixon Dep. 32:25-36:3.) These two areas had separate entrances and staircases. (*Id.* at 36:12-15.) Production employees on the raw side would obtain certain items from a laundry room, which is located at the base of the raw side stairway and close to their work stations. (Dixon Dep. 25:13-14;

---

[3] Plaintiffs' suggestion that additional payment of donning, doffing, and related activities through prep time circumvents federal and/or state law is erroneous. Dept. of Labor Wage and Hour Division, Field Operations Handbook-9/19/96 § 31b01a, available at http://www.dol.gov/whd/FOH/index.htm (last accessed October 10, 2010) ("An employer may set up a formula by which employees are allowed given amounts of time to perform clothes changing and washup activities, provide the time set is reasonable in relation to the actual time required to perform such activities"); *Reich v. IBP, Inc.*, 38 F.3d 1123, 1127 (10th Cir. 1994); *Tum v. Barber Foods, Inc.*, 360 F.3d 275, 283 and n.7 (1st Cir. 2004) (rev'd on other grounds). *See also Hosler v. Smithfield Packing Co., Inc.*, Case No. 7:07-cv-00166-H, 2010 U.S. Dist. LEXIS 101916 * 6 (E.D.N.C. 2010) (granting summary judgment on employees' claim that employer be required to measure each individual employee's time spent on compensable pre and post production activities), *adopting mem. and recommendation*, Case No. 7:07-cv-00166-H, 2010 U.S. Dist. LEXIS 101779 *47 (Aug. 31, 2010) ("Defendant cites substantial authority for its position [that it is not required under the FLSA to measure each individual employee's time spent on compensable pre and post production activities] and it appears to conform with applicable law.")); *Parker v. Smithfield Packing Co., Inc.*, Case No. 7:07-cv-00176-H, 2010 U.S. Dist. 101927 *6 (E.D.N.C. Sept. 27, 2010) (same), *adopting mem. and recommendation*, Case No. 7:07-cv-00176-H, 2010 U.S. Dist. LEXIS 101185 *37 (Aug. 31, 2010).

Cannon Dep. 48:2-7; Mitchell Dep. 44:10-12.) Conversely, production employees on the ready-to-cook area obtained these items from two different clean rooms, depending upon whether they work in the West Pack or East Pack department. (Dixon Dep. 58:10-17.) These clean rooms were located immediately in front of the door to the ready-to-cook production line. (*Id.* at 40:17-23.) Therefore, employees working in the ready-to-cook area did not obtain items to be donned in the laundry room. Moreover, unlike employees on the raw side, employees on the ready-to-cook side acquired certain items from the clean room in a "buffet" style manner in which employees just picked up items as they walk through the area. (*Id.* at 136:18-25.)

Similarly, the type of gear donned and doffed also varied greatly among members of the proposed class. For example, employees who utilized a knife during operations were required to don a cut resistant glove, whereas other employees are not required to wear such gear. (Dixon Dep. at 41:14-24.) Additionally, some employees chose to wear certain optional items, such as plastic sleeves or a plastic apron, while other employees did not because Smithfield did not mandate that employees wear such items at the K-1 facility. (Cannon Dep. 25:18-21.) Moreover, only employees working in the ham stuffing, smokehouse, west pack, smoke chops, and vat wash room donned smocks, while the remaining employees at the K-1 facility did not wear these items. (*Id.* at 28:12-34:16.)

### 3. The amount of time spent engaging in donning, doffing, and related activities is considerably different among the proposed class members.

Furthermore, the amount of time spent on such activities varied widely among the proposed class. In fact, Plaintiff Mitchell could not even establish how long it took her to engage in these activities during a given day. Ms. Mitchell initially testified that spent 30 minutes before her shift began putting on equipment, obtaining equipment, sanitizing, and walking to her work station. (Mitchell Aff., Doc. 73-13, ¶ 6.) However, during her deposition, she testified that she had no idea how long it took her to engage in any donning or sanitizing activities at the beginning of the day. (Mitchell Dep. 39:6-13, 41:3-15, 42:12-21, 66:6-14, 68:9-10, 69:25-70:5.) Conversely, Dauna Gooding testified that she spent 15 minutes engaged in donning activities prior to her scheduled shift. (Gooding Decl., Doc. 73-16, ¶ 6.) The time

spent for donning and doffing activities post-shift also varied among employees. Charlene Mills testified that she spent five minutes engaged in these activities. (Mills Decl., Doc. 73-19, ¶ 9.) On the other hand, Lakeisha Locust testified that she spent 30 minutes engaged in activities following her shift. (Locust Decl., Doc. 73-18, ¶ 9.). Donning and doffing times among employees also varied at lunch breaks. Plaintiff Cannon initially averred that he spent 10 minutes engaged in donning, doffing, and related activities during lunch. (Cannon Aff., Doc. 73-14, ¶ 8.) However, he subsequently admitted that he had no idea how long he spent on donning, doffing, and related activities during his lunch. (Cannon Dep. 56:7-18, 57:18-58:2, 61:9-14, 62:6-11, 63:12-21, 65:19-66:10.) Plaintiffs even concede that differences in the amount of time for donning, doffing, and related activities exist among the proposed class. Pl's Mem. at 7.

### 4. The pay practices among the proposed class members vary based on job and department.

Finally, Smithfield's compensation practices at the K-1 facility varied among position and department. Employees at the K-1 plant were paid from the beginning of their scheduled shift until punch out. (Allen Dep. 11:14-19.) However, there are at least seven different time clocks that employees manually punched at the end of their shift located in various places across different departments at the facility. (Dixon Dep. 43:17-25, 60:13-18; Allen Dep. 18: 5-7, 18:24-19:2.) Furthermore, beginning in May 2006, Smithfield adopted a new compensation policy in which it paid additional compensation to employees in West Pack and East Pack departments for donning, doffing, and related activities. (Allen Dep. 28:9-21, 34:10-14, 68:15-73:8.) Thus these employees already received compensation for these activities but all other employees at the facility, including Plaintiffs Mitchell and Cannon, received no compensation for donning and doffing.

### 5. Federal courts deny class certification where there are fundamental differences among individual class members.

Federal courts have held that these types of disparities in the donning and doffing context should preclude class-wide certification because of the individualized nature of each claim. For example, in *Gatewood v. Koch Foods of Mississippi, LLC*, poultry workers brought suit for alleging they were not

properly compensated for donning, doffing, and related activities. Case No. 3:07-cv-00082-DPJ-FKB,

Docket Entry Nos. 119 and 120, 2009 U.S. Dist. LEXIS at 113896 at *2 (S.D. Miss. Oct. 20, 2009).[4]

Defendant moved to decertify the conditionally certified class, and the district court granted its motion.

Specifically, the court noted that wide disparities that existed among the class, including the manner, time

and location that these activities occurred, rendered a class wide collective action untenable. The court

explained:

> The plaintiffs' testimony makes clear that they, as a class, are not
> required to wear the same clothing, nor do they follow the same donning
> and doffing practices. In fact, the plaintiffs admittedly put on different
> items, at different times, in different places, all depending on their job
> duties and their own personal practices and preferences. Further,
> discovery has shown that the differences in the plaintiffs' work
> environments make the use of class-wide proof inappropriate. Not only
> do the physical layouts of the plants differ dramatically, but the facilities
> follow differing practices with regard to distribution of protective
> clothing and the available means of washing/sanitizing hands and
> equipment. Such differing practices will require individual proof with
> respect to activities at issue and the amount of time each individual
> plaintiff is seeking to recover.

*Id.* at *53-54. Similarly, in *Lugo v. Farmer's Pride, Inc.*, the United States District Court for the Eastern

District of Pennsylvania recently decertified a conditionally certified class of poultry workers because,

*inter alia*, the large differences among the class concerning donning and doffing activities. Case No.

2:07-cv-00749-MMB, Docket Entry No. 491, 2010 U.S. Dist. LEXIS 88139 at *38 (E.D. Pa. Aug. 25,

2010). Significantly, the court summarized some of the variations among the class:

> First, while plaintiffs bear some general similarities to one another, the
> evidence indicates that plaintiffs worked in different positions and
> departments and on different shifts at defendant's plant, and that these
> positions and departments varied not only as to the PPE required and
> worn, but also as to the scheduled followed and the amount of time
> provided for donning-and-doffing activities before and after the shifts
> and meal periods.

---

[4] *Koch* concerned whether the conditionally certified class should be decertified under Section 216(b)'s collective action. Importantly, Section 216(b)'s "similarly situated" requirement is significantly less stringent than Rule 23(b)(3)'s requirement that common questions predominate for a class to be certified. *Grayson v. Kmart Corp.*, 79 F.3d 1086, 1096 (11th Cir. 1996); *O'Brien v. Ed Donnelly Enters.*, Case No. 07-4553, Docket Entry No. 00615663627, 2009 U.S. App. LEXIS 17368 (6th Cir. Aug. 5, 2009).

*Id.* at \*37-38. As a result of these differences, the court held that class treatment would be inappropriate because the court would be required to conduct many individualized inquiries. *Id.* at \*79 ("given the variations in the predetermined allowances provided by the schedules, as well as the variations in the amount of time workers may need to don and doff their PPE, too many individualized inquiries would be necessary to accurately determine whether defendant undercompensated, and thus is liable to, plaintiffs"). *See also Salazar v. Agriprocessors, Inc.*, Case No. 2:07-cv-01006-LRR, Docket Entry No. 39, 2008 U.S. Dist. LEXIS 40363 (N.D. Iowa Mar. 17, 2008) (denying collective action certification in donning and doffing case where distinctions existed among the proposed class, including items worn, pay practices, and job duties); *Fox v. Tyson Foods, Inc.*, 519 F.3d 1298, 1302 (11th Cir. 2008) (affirming district court's denial of collective action certification because of difference in pay practices among the facility, department, position, and shift).

In the instant case, to support certification of the proposed class for their § 95-25.6 claim, Plaintiffs' assertions of commonality, typicality, and predominance rely upon vague, general allegations that Smithfield's production employees were subject to a uniform policy of nonpayment. Plaintiffs' broad generalizations are factually inaccurate. As demonstrated above, decisions as to both liability and damages depend almost entirely upon issues individual to each proposed class member.

In summary, there are many differences among the members of the proposed class that makes Rule 23 class certification inappropriate. The proposed class members don and doff different items, at different times, in different locations, and remain subject to different compensation practices. Even when there is some commonality among some proposed class members as to the types of gear that are actually donned and doffed, the time expended to engage in such activities varies among the proposed class. (Employee Decls, Doc 73-13-73-19, ¶¶5-6, 8-9.) Indeed, Plaintiffs' even concede that individual questions may exist among the proposed class. (Pls.' Mem. at 7.) Because of these differences, individual inquiries of both liability and damages will be necessary. If the Court agrees with Plaintiffs that each employee must be paid for the exact amount of time they work from first touch to last touch, the Court will have to determine the precise times in which each employee performed their first and last

19

compensable events each day. Such determinations cannot be made on a class-wide basis. These individual inquiries would dominate the proof Plaintiffs must show in any trial and make proceeding as a class action unmanageable, especially given the Plaintiffs' allegations that the time, place, manner, and compensation practiced varied considerably among members of the proposed class. As a result of these differences, like *Farmer's Pride* and *Koch Foods*, the Court will necessarily be required to evaluate alleged liability and damages on an individualized, mini-trial basis. The Fourth Circuit has specifically condemned the use of the class action device under these circumstances.

> Thus in cases where the fact of injury and damage breaks down in what may be characterized as virtually a mechanical task, capable of mathematical or formula calculation, the existence of individualized claims for damages seems to offer no barrier to class certification on grounds of manageability. <u>On the other hand, where the issue of damages and impact does not lend itself to such a mechanical calculation, but requires separate mini-trials of an overwhelming large number of individual claims, courts have found that the staggering problem of logistics thus created make the damage aspect of [the] case predominate, and render the case unmanageable as a class action.</u> And this latter view accords with the purpose of Rule 23 which, was to achieve economies of time, effort, and expense and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other desirable results.

*Windham v. American Brands, Inc.*, 565 F.2d 59, 68 (4th Cir. 1977)) (emphasis added). *See also Mims v. Stewart Title Guar. Co.*, 254 F.R.D. 482, 485 (N.D. Tex. 2008) (stating "courts deny motions for class certification where individualized liability inquiries overwhelm any issues common to the class"). Accordingly, the Court should find that class treatment is inappropriate for Plaintiffs' Section 95-25.6 payday claim.

**D.     Plaintiffs Mitchell and Cannon Cannot Fairly and Adequately Represent or Protect the Interests of the Proposed Class For Their Claim Under the NCHWA.**

As with all requirements of Rule 23(a), the named plaintiffs bear the burden of proving that they will be adequate representatives of the interests and rights of the non-named class members. *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 317 (4th Cir. 2006). A class may only be certified if the class representative will fairly and adequately protect the interests of the class. *Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 179 (4th Cir. 2009). To be an adequate representative, a class representative must "be

part of the same class and possess the same interest and suffer the same injury as the class members." *Gunnells v. Healthplan Servs.*, 348 F.3d 417, 426 (4th Cir. 2003) (quoting *Central Wesleyan Coll. v. W.R. Grace Co.*, 6 F.3d 177, 185 (4th Cir. 1992)); *East Texas Motor Freight Sys., Inc. v. Rodriquez*, 431 U.S. 395, 403 (1977) ("a class representative must be part of the class"). Courts have recognized that the adequacy of representation requirement "tends to merge" with the commonality and typicality requirements. *E.g., Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626 n.20 (1997)). Indeed, as the Fourth Circuit has recognized, plaintiffs must make a specific showing that their interests and injuries are representative of the proposed class. *Reich v. Southern Maryland Hosp., Inc.*, 43 F.3d 949, 951 (4th Cir. 1995) (stating "in most cases where a small number of employees had been allowed to represent the interests of a larger number, the representative employee performed similar, if not identical, work to the non-testifying employees.").

Here, Plaintiffs Mitchell and Cannon are not adequate representatives of the proposed class because they do not possess the same interest and have not suffered the same alleged injury as the proposed class members. Therefore, their interests and alleged injuries are not representative of the class they seek to represent. Unlike members of the proposed class, neither Plaintiffs Mitchell nor Cannon received any additional compensation for donning and doffing activities from Smithfield. Plaintiff Cannon worked as jack driver at the K-1 facility from 2005 until the plant's closure. (Cannon Dep. 29:17-30:13.) Plaintiff Mitchell was employed as a box maker. (Mitchell Dep. 79:10-11, 83:4-7.) Smithfield determined both were ineligible for additional compensation due to their job positions. (Allen Dep. 68:23-69:2.) Moreover, neither Mr. Cannon nor Ms. Mitchell were promised by Smithfield that they would be paid for donning and doffing activities, and both testified that they were paid precisely in the manner that they were told they would be paid. (Cannon Dep. 82:13-20, 83:2-4; Mitchell Dep. 76:1-77:17.) Indeed, Plaintiff Mitchell admitted that she did not work in an eligible position and therefore brought this lawsuit to recover donning and doffing compensation that other employees received at the facility. (Mitchell Dep. 79:10-11, 83:4-7); ("I feel like, well, everybody needs to be paid for the time that

they got in the locker room and did all their PPEs before they clocked in and everything . . . whatever time they spent." (*Id.* at 79:21-80:1)).

Moreover, it is undisputed that the amount of time it took for Plaintiffs Mitchell and Cannon to engage in donning, doffing, and related activities, which is the critical liability question in this case, varied among employees. (Employee Decls, Doc 73-13-73-19, ¶¶5-6, 8-9.) Further, the type of items Plaintiffs Mitchell and Cannon donned and doffed differed compared to other members of the putative class who worked in other departments. (Dixon Dep. 21:16-20; 23:8-24.) Accordingly, Plaintiffs have failed to demonstrate that his interests are representative of the other class members in this action and thus he cannot be an adequate representative of the proposed class. Simply put, Plaintiffs Mitchell and Cannon were subject to different pay practices relative to the proposed class members they now seek to represent. Accordingly, they do not have the same interest and have not suffered the same injury as the proposed class members and therefore are inadequate class representatives under Rule 23.

Additionally, Plaintiffs' credibility issues make them unfit to serve as class representatives. "To judge the adequacy of representation, courts may consider the honesty and trustworthiness of the named plaintiff." *Savino v. Computer Credit*, 164 F.3d 81, 87 (2d Cir. 1998). As discussed above, both named Plaintiffs provided conflicting sworn testimony as to how much time each spent each day donning and doffing. In particular, there were discrepancies between the Plaintiffs' affidavits and their depositions regarding the most significant factual issue raised by the allegations of the Amended Complaint—the amount of time required to complete donning, doffing, and related activities. As the Second Circuit recognized, these discrepancies, because they relate to "the very basis for [plaintiff's] lawsuit surely would create serious concerns as to [plaintiff's] credibility at any trial." *Id. See also Shiring v. Tier Techs.*, Inc., 244 F.R.D. 307, 315 (E.D. Va. 2007) ("Thus, if plaintiff 'displays a lack of credibility regarding the allegations being made or a lack of knowledge or understanding concerning what the suit is about, then the court may conclude that Rule 23(a)(4) is not satisfied.") (citation omitted); *Pacheco v. Boar's Head Provisions Co.*, 671 F. Supp. 2d 957 (W.D. Mich. 2009) (decertifying donning and doffing collective action in part because court was "concerned about the contradictions between Plaintiffs'

affidavits and their deposition testimony"). In other words, Plaintiffs Mitchell and Cannon cannot adequately represent a class seeking payment for donning and doffing when their own credibility on this issue is replete with contradictory sworn testimony.

Finally, related to the credibility issue, the named Plaintiffs lack knowledge concerning the essential facts of this lawsuit. As discussed in detail above, in their depositions, both Plaintiffs admitted that they had no idea how long it took to don and doff their protective gear. (Mitchell Dep. 39:6-13, 41:3-15, 42:12-21, 66:6-14, 68:9-10, 69:25-70:5; Cannon Dep. 70:14-22, 71:10-13, 74:1-3, 74:18-25.) Courts have recognized that the adequacy requirement demands that "class representatives [must] possess a sufficient level of knowledge and understanding to be capable of 'controlling' or 'prosecuting' the litigation." *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 129-30 (5th Cir. 2005); *see Monroe v. City of Charlottesville*, 579 F.3d 380, 385 (4th Cir. 2009) (noting that lack of knowledge of case is grounds for denying certification). Plaintiffs' lack of knowledge regarding their own time spent donning and doffing significantly impairs their ability to speak for a class on this central issue. Therefore, for this reason, Plaintiffs are also inadequate class representatives and their motion for class certification must be denied.

**E.      The Proposed Class Fails the Requirements of Rule 23(b)(1) Certification.**

Plaintiffs also argue certification under Rule 23(b)(1) that certification is appropriate. Stated simply, Plaintiffs' argument misconstrues the purpose and nature of the Rule 23(b)(1) class action. Rule 23(b)(1) class actions are designed when either a defendant might face inconsistent obligations if all interested parties are not plaintiffs (23(b)(1)(A)) or where a plaintiff or potential plaintiff might be deprived of the ability to protect his interests if he is not a party. 5-23 *Moore's Federal Practice* § 23.42 (Matthew Bender 3d ed.). In other words, Rule 23(b)(1) serves the same purpose as compulsory joinder under Rule 19, which is why the two rules share the same language. *Compare* Fed. R. Civ. P. 19(a) (noting that person must be joined if in person's absence her ability to protect her interest may be "impair[ed] or impede[d]" or she may face "otherwise inconsistent obligations because of the interest") *with* Fed. R. Civ. P. 23(b)(1) (class may be maintained if prosecuting separate action would create risk of "inconsistent or varying adjudications" or where adjudication of class would "substantially impair or

impede" another's ability to protect her interest).   In this case, denying Plaintiffs' certification motion would not subject Smithfield to inconsistent obligations because even if a single plaintiff succeeded in securing the relief that Plaintiffs seek, another individual plaintiff could still be unsuccessful.  *See Zimmerman v. Bell*, 800 F.2d 386, 389 (4th Cir. 1986) ("[t]he danger of imposing 'incompatible standards of conduct' on the party opposing the class is also not normally posed by a request for money damages") (citation omitted).  Similarly, the rights of the putative class members would not be impaired simply because one is unsuccessful at obtaining relief because another could still seek the same relief.

Flowing from these underlying purposes are a number of principles that highlight the inappropriateness of a Rule 23(b)(1) class for the instant case.  As a sister court in this circuit explained:

> Subsection (b)(1)(A) is designed to protect the interests of the party opposing the class.  Where that party does not seek the protection of a (b)(1)(A) class action, as [defendant] has chosen not to do in the present case, the availability of the class action asserted under Rule 23(b)(1)(A) is questionable.  *Chmieleski v. City Products Corp.*, 71 F.R.D. 118, 155 (W.D. Mo. 1976).  The appropriateness of a class action under this subsection is further to be questioned in the instant case where monetary damage is the predominating relief sought by the class members.  *See McDonnell Douglas Corp. v. United States District Court*, 523 F.2d 1083 (9th Cir. 1975), *cert. denied, sub nom. Flanagan v. McDonnell Douglas Corp.*, 425 U.S. 911, 96 S. Ct. 1506, 47 L. Ed. 2d 761 (1976)."

*Pruitt v. Allied Chemical Corp.*, 85 F.R.D. 100, 106-07 (E.D. Va. 1980).   Here, Smithfield does not seek the protection of Rule 23(b)(1).  Furthermore, it is undisputed that monetary damages are the predominant form of relief Plaintiffs seek.[5]  (Pls.' Am. Compl. ¶ 1.)   Thus this case is inappropriate for Rule 23(b)(1) certification.

Finally, Plaintiff's Rule 23(b)(1)(B) argument is similarly unpersuasive.  Plaintiffs insist that "[c]ertification is also required under Rule 23(b)(1)(B) because the interest of judicial efficiency would be promoted by having the putative class member' claims adjudicated in a single proceeding, rather than in hundreds of individual suits." (Pls.' Mem. at 19.)  As noted above, Rule 23(b)(1) classes are designed to protect the party opposing the class and the class members.  Nothing in the text of the rule suggests that a

---

[5] In their prayer for relief, Plaintiffs also request injunctive relief.  Given the fact that the K-1 facility is now closed, it is not clear what Plaintiffs seeks to enjoin in this case as it related to the K-1 plant.

Rule 23(b)(1) class is appropriate simply because it might be efficient. Moreover, unlike a Rule 23(b)(3) class action, plaintiffs in Rule 23(b)(1) class actions cannot opt-out of the action. *See Walsh v. Great Atlantic & Pacific Tea Co.*, 726 F.2d 956, 963 n.3 (3d Cir. 1983). Thus a plaintiff with a stronger case and potentially more significant monetary damages would be precluded from individually pursuing his action. Moreover, as demonstrated above, a Rule 23(b)(1) class is inappropriate where individual issues and questions exist among class members. *See, e.g., Rhodes v. E.I. Du Pont de Nemours & Co.*, 253 F.R.D. 365, 381 (S.D. W. Va. 2008) ("[w]hen the relief in question is fraught with individualized issues, resort to Rule 23(b)(1) is inappropriate"); *Horowitz v. Pownall*, 105 F.R.D. 615, 618 (D. Md. 1985) (noting that certification under Rule 23(b)(1)(B) should be confined to causes of action in which there are no individual questions).

Plaintiff insists that 23(b)(1) certification is common in "labor relations" cases like this one, but of the three district court opinions relied on for that proposition, two were antitrust cases, the third was an ERISA case, and all three primarily involved injunctive relief. *See Thomas v. SmithKline*, 201 F.R.D. 386, 397 (E.D. PA. 2001) (certifying (b)(1) class in ERISA lawsuit where relief sought was primarily injunctive); *White v. Nat'l Football League*, 822 F. Supp. 1389, 1409 (D. Minn. 1993) (certifying antitrust settlement class under Rule 23(b)(1)); *Robertson v. Nat'l Basketball Ass'n*, 389 F. Supp. 867, 901 (S.D.N.Y 1975) (certifying antitrust case where injunctive relief could result in inconsistent obligations). In fact, other district courts have rejected arguments for Rule 23(b)(1) certification in FLSA lawsuits like this one. *See, e.g., Bouaphakeo v. Tyson Foods, Inc.*, 564 F. Supp. 2d 870, 907-08 (N.D. Iowa 2008) (finding Rule 23(b)(1) certification "inappropriate" to class of production workers at pork processing plant). In short, Plaintiff's motion for certification of a Rule 23(b)(1) class action must be denied.

**F.      Rule 23 Class Certification Is Fundamentally Incompatible with Section 216(b) Collective Action Certification and Therefore Not Superior to Other Available       Methods**

In the event the Court grants Plaintiffs' Motion for Section 216(b) collective action certification under the FLSA, the Court should deny Rule 23 class certification because the procedures governing the respective actions are fundamentally incompatible and unmanageable and thus Rule 23 class certification

would not be a superior method of adjudicating Plaintiffs' claim under the NCWHA. Section 216(b) of the FLSA expressly limits the scope of a collective action by creating an opt-in procedure, which specifically requires parties to file a consent if they wish to participate in the action. 29 U.S.C. § 216(b) ("no employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought"). Congress established the procedure "for the purpose of limiting private FLSA plaintiffs to employees who asserted claims in their own right and freeing employers from the burden of representative actions" and to specifically prevent excessive litigation involving parties with no personal interest in the outcome of the case. *Hoffman-La Roche, Inc. v. Sperling*, 493 U.S. 165, 173 (1989). In complete contrast to Section 216(b) certification, Rule 23 class certification establishes an opt-out procedure in which parties must affirmatively opt out of an action by filing a consent if they do not want to participate. Fed. R. Civ. P. 23(c)(2)(B)(v). *See De Ascencio v. Tyson Foods, Inc.*, 342 F.3d 301, 310 (3d Cir. 2003) ("stating "[m]andating an opt-in class or an opt-out class is a crucial policy decision").

Recognizing this clear distinction between the two actions, an increasing number of federal district courts have held that Rule 23 class certification of state wage and hour law claims is inappropriate in a Section 216(b) collective action case.[6] These district courts have held that allowing both actions to proceed simultaneously would avoid clear Congressional intent and be unmanageable for the court. As the United States District Court for the Middle District of Pennsylvania explained:

> It is clear that Congress labored to create an opt-in scheme when it created Section 216(b) specifically to alleviate the fear that absent individuals would not have their rights litigated without their input or knowledge. To allow an [sic] Section 216(b) opt-in action to proceed accompanied by a Rule 23 opt-out state law class action claim would essentially nullify Congress's intent in crafting Section 216(b) and eviscerate the purpose of Section 216(b)'s opt-in requirement.

*Otto v. Pocono Health System*, 457 F. Supp. 2d 522, 524 (M.D. Pa. 2006). *See also Powers v. Centennial Comms. Corp.*, 679 F. Supp. 2d 918, 928 (N.D. Ind. 2009) (stating that Congress's goal in creating an

---

[6] *Powers v. Centennial Comms. Corp.*, 679 F. Supp. 2d 918, 928 (N.D. Ind. 2009) (collecting some of these district court decisions finding Rule 23 class certification inappropriate in a Section 216(b) collective action case).

opt-in procedure to prevent excessive litigation would be thwarted to allow both to proceed because "Rule 23 plaintiffs would almost certainly outnumber the collective action plaintiffs . . . making the litigation far more burdensome on employers than anticipated by the drafters of the FLSA"); *McClain v. Leona's Pizzeria, Inc.*, 222 F.R.D. 574, 577 (N.D. Ill. 2004) (holding that plaintiff "cannot circumvent the opt-in requirement and bring unnamed parties into federal court by calling upon state statutes similar in substance to the FLSA that lack the op-in requirement"). These courts have also expressed concern that the two incompatible procedures would confuse potential class members, especially when the majority of the proposed class likely does not speak English or understand the legal system. *See De La Cruz v. Gill Corn Farms, LLC*, Case No. 1:03-cv-01133-TJM-DRH, Docket Entry No. 62, 2005 U.S. Dist. LEXIS 44675 at *19-20 (N.D.N.Y. Jan. 25, 2005) (citing *De La Fuente v. FPM Ipsen Heat Treating, Inc.*, Case No. 3:02-cv-50188, Docket Entry No. 19, 2002 U.S. Dist. LEXIS 24040 at *5-6 (N.D. Ill. 2002)) (holding that a notice that calls both for a decision to opt in to a collective action and also whether to opt out of the class action is an inherently difficult task that could confuse a likely proposed class of non-English speaking migrant farm workers); *Powers*, 679 F. Supp. 2d at 927 (noting the likely confusion among proposed class members between the two separate procedures).

Here, Plaintiffs are seeking Section 216(b) class certification for its FLSA claims, as well as Rule 23 class certification for its claim under the NCWHA. To permit Plaintiffs to simultaneously proceed under both procedures would circumvent clear Congressional intent and potentially confuse the proposed class, many of whom speak little or no English. The Court should not allow the circumvention of federal law and permit Plaintiffs to "shoehorn" in class members "through the vehicle of calling upon similar state statutes that lack such an opt-in requirement." *Rodriquez v. The Texan, Inc.*, Case No. 1:01-cv-01478, Docket Entry No. 2, 2001 U.S. Dist. LEXIS 24652 at *3 (N.D. Ill. Mar. 7, 2001). Accordingly, to the extent the Court grants Plaintiffs' Section 216(b) motion for collective action certification, the Court should deny Rule 23 class certification as it is not the superior method to adjudicate Plaintiffs' claim under the NCWHA. *Powers*, 679 F. Supp. 2d at 927; *McClain*, 222 F.R.D. at 578.

## IV.  CONCLUSION

For all of the foregoing reasons, Plaintiffs' Motion for Rule 23 class certification of their payday claim under Section 96-25.6 of the NCWHA should be denied.   In short, Plaintiffs fails the commonality and typicality requirements under Rule 23(a)(2) and predominance and superiority under Rule 23(b)(3) because Plaintiffs' claims are highly individualized and will necessarily require fact-intensive liability and damages inquiries.   Additionally, Plaintiffs cannot fairly and adequately represent the putative class because they do not possess the same interest and have not suffered the same alleged injury as the putative class members, they lack credibility, and they fail to possess significant knowledge about the fundamental issues involved in this case.  Accordingly, class certification should be denied.

Respectfully submitted this 13th day of October, 2010.

/s/ Julia M. Ebert

D. Christopher Lauderdale
lauderdc@jacksonlewis.com
Julia M. Ebert (NC Bar No. 34182)
ebertj@jacksonlewis.com
JACKSON LEWIS LLP
One Liberty Square
55 Beattie Place
Greenville, SC 29601
Telephone: (864) 232-7000
Facsimile: (864) 235-1381

and

L. Dale Owens
owensd@jacksonlewis.com
JACKSONLEWIS LLP
1155 Peachtree Street, NE, Suite 1000
Atlanta, GA 30309-3600
Telephone: (404) 525-8200
Facsimile: (404) 525-1173

ATTORNEYS FOR DEFENDANT

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| ANGELINA MITCHELL and<br>JERRAINE CANNON, on behalf of<br>themselves and all others similarly situated, | ) )<br>) )<br>) ) | |
| | ) ) | |
| Plaintiffs, | ) ) | |
| | ) ) | C/A No.: 4:08-CV-182-H |
| v. | ) ) | |
| | ) ) | |
| SMITHFIELD PACKING COMPANY,<br>INC., | ) ) | |
| | ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

## CERTIFICATE OF SERVICE

I certify that on October 13, 2010, I filed the foregoing with the Clerk of Court using the Court's

Electronic Filing/Case Management System, which will automatically serve all attorneys of record.

/s/ Julia M. Ebert
Julia M. Ebert

4838-8470-1191, v. 1